Ranney, J.
The parties to this suit are the surviving heirs at law of Michael Brocaw, late of Hamilton county, and the object of the bill is to effect partition, upon equitable principles, of certain lands therein described.
Michael Brocaw died in 1847, intestate, and leaving Cornelia H. White, Michael Y. Brocaw, Ann Y. Benson, and Maria Brocaw, his only children and heirs at law.
Maria Brocaw died in 1852, leaving a will, by which she endeavored to dispose of the lands of which partition is sought— the one half for life-to Mrs. Benson, with remainder to Michael Y., and the other half to Michael Y. in fee, charged with a legacy of $1000 to Mrs. White.
It is conceded in the bill that she died seized of the legal title to this land; but it is averred that she held it 'in trust for the heirs of Michael Brocaw, it having been conveyed to her many years before, by one Humes, at the instance of the father, and for the purpose of defrauding his creditors.
While these are the averments of the bill, it is nevertheless argued, and the evidence tends to show, that Humes had previously executed and delivered to the father a deed for the land, which was delivered up or destroyed when the deed to the daughter was made; and thereupon it is insisted, that the father’s title was not divested by the cancellation of this orignal deed, nor did the second deed vest any title in the daughter.
However abstractly correct this position may be, yet it is very certain that neither this, nor the reason stated in the bill for invalidating the deed to the daughter, or engrafting a trust upon it, standing alone, can lay any foundation for relief in the present case.
If the evidence made it certain that such a prior deed waa made, a conclusive objection to its availability would be found in the fact, that there is no averment in the bill to which such evidence can be referred. To allow it to be given, would be *341 to allow, not only a case to be made upon proof without allegations, but to allow the allegations of the pleading to be contradicted by the proofs; while the familiar rule is, that they must correspond in equity as well as at law.
In respect to the ground for relief stated in the bill, to which reference has been made, it is enough to say, that no principle is better settled than that a conveyance made to defraud creditors is good between the parties, and no remedy is afforded the fraudulent grantor or his heirs to reclaim the property. . But this rule has its foundation in the anxiety of the law to discourage frauds, and the moral obligation of the grantee to restore property so held, is not only clear, but is fully recognized in the decided cases. Swift v. Holdridge, 10 Ohio Rep. 230. If he does restore, the law discharges him from liability as a trustee for the creditors of his grantor, and undoubtedly any steps taken, or acts done by him, subsequent to the conveyance, .toward the discharge of this moral duty, should receive the favorable consideration of a court of equity.
The bill, however, proceeds to state other grounds for relief, and upon these, it is evident, the rights of the parties must depend. In support of the respective claims of the parties upon this part of the case, an immense volume of testimony has been taken, much of it irrelevant and contradictory, and consisting largely of verbal statements and admissions made many years before the depositions were taken. This testimony has all been carefully examined by us, but we are of the opinion, that very few of the disputed questions to which it gives rise, require a solution; and that the substantial rights of the parties rest upon a few extrinsic facts, either not disputed or clearly established, necessary to give application to the written instruments executed by the heirs of Michael Bro-caw since his death.
It is a conceded fact, that shortly prior to the year 1809, Michael Brocaw bought and paid for the land in controversy; and that on the 9th of March in that year, at his instance, John Humes (the vendor) made a deed of general warranty to Maria Brocaw. Maria was'then about nine years of age, without property, blind and otherwise afflicted, and continued com *342 paratively helpless to the time of her death. Michael Brocaw took immediate possession of the property, proceeded to im prove it by buildings and otherwise, and occupied it as a home stead to the time of his death in 1847.
In 1834 he bought and took a conveyance of what is known in the case as the “Crane farm;” and.about the same time, he became the legal owner of what is called in the case, the “ ministerial tract.” Soon after his death, the complainants, at least, interposed the claim that he had died seized in fee of the legal title to the two last-named tracts, and of the equitable title to the first, and that the whole should be divided among his heirs- at law; conceding, however, the right of Maria to remain in possession of the homestead during her life. On the other hand, Michael Y. claimed to be the absolute owner of the “ Crane farm; ” that he had paid a consideration to his father for it, and had taken a deed from him several years before his death, which had never been recorded, and could not then be found; that he had contributed both by his labor and money to the improvement of the homestead, especially in building the house upon it; and that he was entitled to an interest in that place, or at least against the estate, for the amount of these contributions.
It is very difficult to ascertain from the evidence what the claims of Maria were, as to her title to the homestead; and we therefore simply assume that she made no claim inconsistent with the plain object, purposes and legal effect of the written instruments to which she was a party; and that those who represent her interests, are not to be affected further than is necessary to give those instruments their proper effect.
In this posture of the controversy between these heirs, through the friendly intervention of the administrator and others, they came to a compromise and settlement of their disputes, and immediately proceeded to execute the agreement they made. The agreement was simply this: That the three daughters should quit claim to Michael Y. the “ Crane farm,” that he in turn should quit claim to them the “ homestead,” and that the “ministerial section'” should be equally divided between the four. In pursuance of this agreement, the quit *343 claim deeds were executed and delivered to the respective parties on the 15th day of March, 1847, and a few days thereafter, a partition of the “ ministei’ial section ” was effected by a written agreement, signed and sealed by the parties, contain ing mutual releases, and under which possession was taken by each, of the part allotted to him or her, and has ever since been maintained. In each of the quit claim deeds, a covenant is inserted by which the grantors agree to “ warrant and forever defend the said premises against all persons claiming or to claim, by, from, or under them, their heirs or assigns.” Upon this covenant contained in the deed of Michael Y., is founded his application, by way of cross bill, to have the instrument reformed and corrected by striking this covenant from it, upon the ground that it was inserted by mistake of the draftsman, and was unknown to the parties when the deed was executed. And it seems to be supposed, that, without such relief, his subsequently-acquired title under the will of Maria, might immediately enure to the benefit of his grantees in the quit claim deed. It might be enough, in answer to this application, to say, that it is not supported by such evidence of mistake as would authorize the court to interfere with the written instrument. But the court is also of the opinion, that the covenant works no such consequence as is supposed, and that it is not of the slightest consequence whether it is in or out of the deed. The deed is in the ordinary form of bargain, sale and release, and purports only to convey to the grantees “all the estate, right, title, interest, claim and demand, both in law and equity, of the said Michael Y. Brocaw and Magdalene his wife, of, in and to, the said premises and every part thereof.” It contains no recital, or other description whatever, of any particular interest owned or possessed by the grantors, or intended to be conveyed; and where that is the case, it is well settled that the warranty is only co-extensive with the grant, and binds only the vested interests of the grantor in the property at the time, and does not extend to an after-acquired title. Mr. Rawle says : “ There is still another qualification to the doctrine of estoppel being caused by a covenant of warranty, which is that where the deed does not, on *344 its face, purport to convey an indefeasible estate, but only thá right, ‘ title and interest5 of the grantor, even although tha deed may contain a general covenant of warranty, yet, in cases where that covenant is held to be limited and restrained by the estate conveyed, and not to warrant a perfect title, the doctrine of estoppel has been held not to apply; in other words, although a warranty is invested with the highest functions of an estoppel in passing, by mere operation of law, an after-acquired estate, yet it will lose that attribute when it appears that the grantor intended to convey no greater estate than he was possessed of.” Rawle on Covenants, 420; Blanchard v. Brooks, 12 Pick. 67; Brown v. Jackson, 9 Wheat. 452; White v. Shaw, 5 Cush. 56; Miller v. Ewing, 6 Cush. 34.
This question being disposed of, we are again remitted to the compromise, and the instruments executed to carry it into effect, as the only remaining ground upon which the complainants can demand the relief prayed for in the bill.
Although imputations of fraud and surprise are not wanting, we are entirely convinced that they have no foundation in fact. The parties were all of full age, and seem to have been sufficiently alive to their respective interests. Their confidence in each other was not overweening, and we have little doubt, that each took as much and gave as little, as a strict regard for moral obligation would allow. Michael V., at least, declined to act until he had taken legal advice, and while it is true, that Maria was blind and otherwise decrepit, yet, the defendants have carefully proved by the testimony of Mrs. Benson, that “ she had a very strong mind,” . . . “ a very good judgment,” and “was as capable of transacting business as almost any person she ever knew;” added to which it may be stated, that she had a very competent and disinterested person present to assist her in these negotiations. As these instruments were all executed as parts of one and the same transaction, and to effect a single purpose, they must be read and considered together, and their combined effect must settle the rights of the parties. What then was this purpose? Plainly and clearly to effect a division of the real estate of *345 Michael Brocaw, between themselves as his heirs at law, and according to their respective interests in it. And we are equally clear in the opinion, that the object was consummated upon the basis of treating and considering the whole of the three tracts as belonging to the estate, and subject to such division. Indeed, the parties themselves under their hands and seals, in a paper very bunglingly drawn, it is true, have almost saved us the trouble of drawing the necessary inferences from the instruments already referred to. On the very day that the last of these papers was executed (20th March, 1847), they signed and sealed the following paper: “ Whereas, the undersigned heirs at law of Michael Brocaw, senior, deceased, for and in consideration of certain premises granted, have made certain quit claim deeds among ourselves in which we surrendered to each other all and any claims we had of a private nature against said Michael Brocaw’s estate whatever. Witness our hands and seals, this twentieth day of March, A.D. 1847.” This paper very conclusively shows, that the quit claim deeds were designed to effect an extinguishment of all claims of a private nature upon the lands conveyed by them, and to surrender them to the estate of their father. Nor did a surrender of all these lands to the estate, involve anything more than a settlement of the various disputes then pending between the parties. If Michael Y. had no deed, the “ Crane farm,” belonged to the estate, and was subject to division. If the homestead was conveyed to Maria to defraud creditors, it was her moral duty to restore it; or if, as stated by Mrs. Benson, it was conveyed to her, because of her afflictions, to provide her a support and to protect her from want, it would seem to be almost equally obvious, after it had accomplished that purpose, that the property, upon which the father had expended a lifetime of labor, should have been restored to his heirs. It is quite immaterial whether the claims made upon these two tracts by the complainants, were well or ill founded; they were made, and have been settled, and the only question now is, whether the law will permit that settlement to be disturbed. In our opinion it will not; and we are further of opinion, that, upon well-settled legal principles, both Maria and Michael Y., *346 after taking the benefits and securing the advantages of the arrangement, were conclusively estopped from asserting any title to the homestead, inconsistent with the title which they concurred in assuring to the complainant.
If there is any one thing which the law favors above another, it is the prevention of litigation, by the compromise and settlement of controversies. And this is especially true of family controversies, where, to the evil effects of litigation generally, must often be added the disturbance of social relations among-those who ought to live in harmony and mutual confidence with each other. In Parsons on Contracts, it is said: “ With the courts of this country, the prevention of litigation is not only a sufficient, but a highly-favored consideration ; and no investigation into the character or value of the different claims submitted, will be entered into for the purpose of setting aside a compromise.” 1 Pars.' on Cont. 365. It has never been deemed material, whether the controversy related to real or personal property. In Penn v. Lord Baltimore, 1 Ves., senr. 444, which was a bill brought to enforce an agreement for the settlement of boundaries, in answer to the objection that no sufficient consideration was shown, Lord Hardwicke said, “that the agreement in question was not without consideration; for though nothing valuable was given on the face of the articles as a consideration, the settling boundaries, and peace and quiet, formed a mutual consideration on each side, and in all cases make a consideration to support a suit in chancery, for the performance of the agreement for settling the boundaries.” In Hoge v. Hoge, 1 Watts, 216, C. J. Gibson held, that a compromise of a doubtful title was binding upon the parties, although ignorant of their rights, unless vitiated by fraud sufficient to avoid any other contract. And in O’Keson v. Barclay, 2 Penn. R. 531, the court went the extreme length of holding a promise to pay a sum of money, for the compromise of a slander suit, binding upon the party, although the words laid in the declaration were not actionable. The books abound with cases upon this subject; but they are all to the same purpose, and it can not be neces *347 sary to cite further authorities in support of a doctrine so well settled.
In the case under consideration there was not only a settlement of doubtful and disputed questions, but, upon the theory of the defendants, Mrs. White and Mrs. Benson surrendered valuable rights in the compromise actually made. This will be apparent when the relative situation of all the parties is considered. Allowing Maria to have been the unquestioned owner of the homestead, as it is not pretended she ever paid any consideration for it, it would have constituted an advancement equal to her entire share in her father’s estate; and making the same concession to Michael, in respect to the Crane farm, the most favorable view of the evidence would place him very much in the same situation. If no compromise had been made, this would have left the ministerial section to be divided between Mrs..White and Mrs. Benson; but in the settlement Maria and Michael each obtained one fourth of this tract. Neither the state of feeling between the parties, nor the tenacity with which the interests of each seem to have been guarded, permits the inference that this was intended as a gratuity; and it admits of no other explanation, than that they all supposed the three tracts were subject to division; that it was effected by the quit claim deeds; and that what was lost to the complainants in the ministerial tract, was gained in the homestead.
Now, after all the advantages of the arrangement have been realized by himself and Maria, Michael Y. for himself and as the representative of Maria, proposes to withdraw the assertion, made under the hands and seals of all the parties in interest, that all claims of a “private nature” to the lands covered by the quit claim deeds, were “ surrendered ” to the estate, and to be permitted now to show that, in point of fact, the estate had no interest in the homestead or Crane farm. And leaving Mrs. White to bear her losses in the ministerial tract, and with her deed to him of the Crane farm _'n full force^ he insists that she took nothing by his deed to her of the homestead. If there is any virtue in the law of estoppels, this can not be done. It is needless to cite the numerous cases in *348 which that doctrine has been applied. They all resolve themselves into the single proposition, that one can not induce another to do acts to his prejudice, upon the assumption that certain facts exist, and be afterward permitted to deny those facts. It is a rule no less of morals than of law, and imposes silence upon the party, when the utterance of the truth would convict him of a previous falsehood, upon the faith of which others have dealt. The fact aforesaid in this instance, and upon which all the deeds were made, was that all these lands, in equity, belonged to the estate of Michael Broeaw, and no one of the parties, in the absence of fraud or unfairness, can be now permitted to deny that fact. Upon its existence as a fact, Michael Y. surrendered his interest in the homestead to the three sisters, and they concurred in assuring him a title to the Crane farm and one fourth of the ministerial section. Maria gave and received conveyances, upon the same assumption, and as a part of the arrangement secured important interests to herself, to the prejudice of her sisters, unless they acquired interests in the property now claimed for her. All this was unavailing to divest her of the legal title; but it bound her in equity to make good the compromise, and equally binds those who claim under her will.
A question arises upon the will of Maria, as to the legacy of $1,000 charged upon the home farm in favor of Mrs. White. In our opinion the legatee must elect, whether she will take the relief asked for in the bill, or the legacy, and that she can not have both. It is an exceedingly stubborn principle, that no one shall be permitted to claim under, and adverse to a will. If the testator assumes to dispose of property belonging to the devisee or legatee, the latter, accepting the benefit, must also make good the testator’s attempted disposition. Mr. Jarman says : “ It is immaterial in regard to the doctrine of election, whether the testator, in disposing of that which is not his own, is aware of his want of title, or proceeds on the erroneous supposition, that he is exercising a power of disposition which belongs to him; in either case, whoever claims in opposition to the will, must relinquish what the will gives him.” Whistler v. Webster, 2 Ves., jr. 370. It may be, that *349 the doctrine is rather one of compensation than forfeiture, and that the legatee would be entitled to any surplus, after making good the value of what was taken from the dispositions of the will; but this case calls for no solution of that question, as there is no doubt that Mrs. White takes from the devisees of Maria, more, than the entire amount of this legacy.
A decree can be taken establishing the compromise, and ordering partition.
Peck, C J., and Brinkerhorr, Scott, and Wilder, JJ., concurred.